COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**
**NO. 02-14-00245-CV**


IN THE INTEREST OF S.G., I.G.,
AND B.G., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98069J-13

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court terminated Appellant Father's parental rights to youngest daughter, B.G., and named Appellee Texas Department of Family and Protective Services (TDFPS) permanent managing conservator (PMC) of S.G., I.G., and B.G. In four points, Father contends that the trial court erred by permitting him to proceed to trial without counsel and that the evidence

---

[1]*See* Tex. R. App. P. 47.4.

is legally and factually insufficient to support termination. Because we hold that the trial court did not reversibly err and that the evidence is legally and factually sufficient to support the termination of Father's parental rights to B.G., we affirm the trial court's judgment.

Initially, we note that the trial court did not order Father to pay child support. Daughter S.G., who has since turned eighteen years old, is therefore not part of this appeal.[2] Further, Father's last three points pertain only to the termination of the parent-child relationship between B.G. and him.

**Absence of Trial Counsel**

In his first point, Father contends that the trial court erred by allowing him to proceed to trial without an attorney. Father did not request appointed trial counsel or raise indigence before trial. During the announcement of trial, the following exchange between the trial court and Father occurred:

THE COURT: And, sir, please state your name for the record.

. . . FATHER: [I.G.]

THE COURT: And you're [I.G.,] Jr.; is that correct?

---

[2]See Tex. Fam. Code Ann. §§ 101.003 (defining child as "*a person under 18 years of age* who is not and has not been married or who has not had the disabilities of minority removed for general purposes") (emphasis added), 263.404 (providing that "[t]he court may render a final order appointing the department as managing conservator of the *child*") (West 2014) (emphasis added); *see also In re E.H.*, No. 02-07-00343-CV, 2008 WL 2404490, at *1 (Tex. App.—Fort Worth June 12, 2008, no pet.) (mem. op.) (dismissing appeal as moot because child had turned 18 during pendency of appeal and appealing parent had not been ordered to pay child support).

. . . FATHER:   No—yes, yes.

THE COURT:   Is that your name?

. . . FATHER:   Yes.

THE COURT:   Okay.  And I have a note in the file that you're representing yourself.  Is that correct?

. . . FATHER:   Yes, ma'am.

THE COURT:   And you're aware that you may have a right to have an attorney represent you?

. . . FATHER:   I don't see I need one.  I ain't got no lies.  I just got the truth to say.

THE COURT:   Okay.

. . . FATHER:   I mean, y'all can ask me anything you want, and I'll tell you this truth 100 percent, ma'am.

THE COURT:   All right.  Well, I just want to make sure you understand that if you're indigent you have a right to have a court-appointed attorney represent you in this proceeding, and the Court would appoint one for you.  So I assume you've been told that in the past.

. . . FATHER:   Yes.

THE COURT:   On several occasions?

. . . FATHER:   Yes.  But, like I said, ma'am, I—I don't—I don't believe I need one.

THE COURT:   All right.  That's your decision.  I just want to make sure you understand your rights.

. . . .

THE COURT:   The alleged father of the children is [Father], who appears here today.  The Court will make note of a few things.

3

First of all, the Court will make note that you have executed a waiver of service acknowledging a receipt of the original petition in this cause, and that waiver is on file with this court. The Court will also make note for the record that on file with this court is a Certificate of Paternity Registry Search, indicating that a diligent search of the paternity registry has been made, and no notice of intent to claim paternity has been located concerning any of the children the subject of this suit. And those three documents are on file with this court, and the Court will take note of that. The Court will further make note for the record that also on file with this court is a letter from the State Registrar of Texas Vital Statistics.

. . . FATHER: Ma'am.

THE COURT: Yes.

FATHER: I think I might need an attorney, because half of that stuff you just said, I don't—I don't understand, like the (inaudible).

(Interruption by reporter.)

THE COURT: All right. Well—

. . . FATHER: Those blue papers, I didn't understand.

THE COURT: I always think you need to have an attorney represent you. That would be my advice. The problem we have is that we're at trial right here today.

. . . FATHER: I just didn't understand what that blue—when you were talking about the blue papers.

THE COURT: Right. But if you want an attorney, then I would consider appointing one for you and then setting this in just a couple of weeks and having another trial so you'd have time to meet with your attorney.

4

>           The blue papers are—I'm making note of documents on file in this court. There is a paternity registry, children who are born that are not born as part of a marriage. Then to establish whether—if someone wants to claim that they're the father to the children, then they can file with this paternity registry.

. . . FATHER:      I was—I am the father.

THE COURT:      That's all right. You can claim that in court.

. . . FATHER:      I mean, I'm on their birth certificates.

THE COURT:      All right. And that's fine. The Court just doesn't know that. So we can just have you claim that as part of the court. I'm just making note for the record of the documents on file with this court at this time.

>           All right. Do you want me to recess this matter so you can get an attorney?

. . . FATHER:      No, no. Let's continue, please.

THE COURT:      All right. Well, if you have any—if you want to have an attorney, I will recess this matter and appoint an attorney and give you time to work with your attorney.

. . . FATHER:      No. Let's continue.

THE COURT:      All right. If you have any questions, if you'll just raise your hand, I'll stop and try to do a better job of explaining things to you. All right?

. . . FATHER:      All right.

After the trial court rendered judgment terminating Father's parental relationship with B.G. and placing all the children in the permanent managing conservatorship of TDFPS, the trial court once again implored Father to file an

5

affidavit of indigence so that he could receive appointed appellate counsel if the court found him indigent:

> [THE COURT]: Now, [Father], I want you to know that you have a right to appeal this decision, and you have a right to have an attorney represent you in that appeal, and I can tell you that it is very complex, and there's no way that you could do that yourself. If you are indigent, then you'd be entitled to have an attorney appointed by this court to represent you, but you need to fill out that paperwork. I would do it since you—especially since you live in California, you need to do that today while you're here. Maybe [Mother's trial counsel] would direct you. If not, my staff will direct you back to my coordinator's office, and there's—there's a form that you can fill out to be appointed an attorney, and if you meet the indigency qualifications, the Court would appoint you an attorney if you want to appeal this case.
>
> . . . FATHER: Yes. I want to appeal it.
>
> THE COURT: All right. Then go fill out that paperwork before you leave the building to make sure that you have—that you meet the qualifications in order to get a court-appointed attorney.
>
> All right. That will be the order of the court.

Appointed counsel for appeal did not file a motion for new trial.

Appellant relies on *In re J.M.*[3] and *In re C.D.S.*[4] in arguing that the trial court erred by allowing Father to proceed to trial without counsel. Those cases are distinguishable. In *J.M.*, our sister court in Amarillo held that the trial court

---

[3] 361 S.W.3d 734 (Tex. App.—Amarillo 2012, no pet.).

[4] 172 S.W.3d 179 (Tex. App.—Fort Worth 2005, no pet.).

committed reversible error by proceeding to trial without appointing counsel for a mother who, like Father, never affirmatively requested trial counsel or filed an affidavit of indigence.[5] The trial record in *J.M.*, however, as our sister court discussed, demonstrates that the mother had been sentenced to prison about three weeks before the termination trial and that she had been found indigent for purposes of her criminal case.[6] Specifically, the bill of costs attached to the criminal judgment, which TDFPS offered as a trial exhibit, implicitly shows that appointed counsel had represented the mother in her criminal case.[7] Significantly, the trial court in *J.M.* never inquired about indigence or trial counsel for the mother.[8]

In contrast, the trial court here repeatedly gave Father an opportunity to fill out an affidavit and request trial counsel. Further, the only evidence at trial regarding Father's then current financial status did not suggest indigence. Dereka Davis, a conservatorship worker with TDFPS who had been assigned to the case since February 2014, testified that Father provided proof of employment and told her that he had a housekeeper. Father testified that he was renting a double-wide mobile home with three bedrooms and two bathrooms. Additionally,

---

[5]361 S.W.3d at 739.

[6]*Id.* at 735–36.

[7]*Id.* at 736.

[8]*Id.* at 735–36, 739.

7

Father testified that he had three part-time jobs and also had some contract jobs of his own, all in the construction industry. He also stated that "work just exploded for" him and that he was "so busy" that he was "running around like a chicken with no head," which he described as "a good thing because [he could] finally provide for [the children] the real way you're supposed to." He did not submit evidence on the indigence issue until after the trial court's rendition.

In *C.D.S.*, this court held that the trial court abused its discretion by not finding the mother indigent and not appointing her trial counsel.[9] The mother had filed an affidavit of indigence and requested appointed trial counsel on the day of the emergency removal hearing, several months before trial.[10] On the other hand, in the case before us, Father did not file any indigence documents during the seventeen months from the filing of the termination petition until trial began, he declined the trial court's offer to file an affidavit at the beginning of trial and thereby perhaps secure appointed trial counsel and a continuance, and he did not offer any evidence to trigger an indigence inquiry before the trial ended. We are not prepared to hold that the trial court erred by allowing Father to proceed to trial without an attorney or by not appointing trial counsel in the face of Father's resistance.

---

[9] 172 S.W.3d at 185–86.

[10] *Id.* at 185.

**Absence of *Faretta*[11]-type Warnings**

In his alternative point, Father contends that the trial court erred by not warning him about the dangers and disadvantages of self-representation and by not ensuring that his waiver of trial counsel was knowing and intelligent. Father did not raise this point in the trial court; it is therefore not preserved.[12] We nevertheless point out that while the governing statute at the time of trial did not require admonishments,[13] the admonishments provided by the trial court comply with the admonishments required by the statute as amended after trial.[14]

_____

[11]*Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525 (1975).

[12]*See* Tex. R. App. P. 33.1(a); *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex.) (refusing to reach merits of issue not raised in intermediate appellate court), *cert. denied*, *Carroll v. Faucheux*, 546 U.S. 961 (2005); *In re L.M.I.*, 119 S.W.3d 707, 708–09, 711 (Tex. 2003) (holding argument that parent's affidavit of relinquishment was secured in manner violating due process waived because not raised in trial court), *cert. denied*, *Duenas v. Montegut*, 541 U.S. 1043 (2004); *In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003) (holding fundamental-error doctrine inapplicable to procedural preservation rules and that due process does not mandate appellate review of unpreserved issues in parental termination cases), *cert. denied*, *Dossey v. Tex. Dep't of Protective and Regulatory Servs.*, 541 U.S. 945 (2004); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (holding failure to raise constitutional issue below bars its appellate review); *In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *8 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding father failed to preserve argument that proceeding to trial in his absence violated his constitutional rights).

[13]Act of May 20, 2013, 83rd Leg., R.S., ch. 810, § 9, 2013 Tex. Gen. Laws 2029, 2032 (current version at Tex. Fam. Code Ann. § 262.201(a-1) (West 2014)); *In re K.M.L.*, 443 S.W.3d 101, 122 (Tex. 2014) (Lehrmann, J., concurring).

[14]*See* Tex. Fam. Code Ann. § 262.201(a-1).

9

Further, Father had a "pretty lengthy criminal history," including prison confinement, and testified that he had been told "[o]n several occasions" that if indigent, he would have a right to representation by court-appointed counsel. Unlike the records in *K.M.L.* and *J.M.*, the record in the case before us is decidedly not "devoid of any indication that [Father] knew of [his] rights to claim indigency and request counsel."[15] Instead, the record shows that he waived that right. We overrule Father's first point, the only point challenging the trial court's order naming TDFPS PMC of his son, I.G.

**Endangerment Evidence**

In his second and third points, Father challenges the trial court's endangerment findings supporting the termination of his parental relationship with B.G.,[16] contending that the evidence is legally and factually insufficient to support the findings. As we have previously explained,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being.

---

[15]*K.M.L.*, 443 S.W.3d at 123 (Lehrmann, J., concurring) (quoting *J.M.*, 361 S.W.3d at 739).

[16]See Tex. Fam. Code Ann. §161.001(1)(D), (E) (West 2014).

Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being. . . . [E]ven if a parent makes dramatic improvements before trial, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.[17]

Abusive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being, as may parental drug use and drug-related criminal activity.[18] Drug use and its effects on a parent's life

---

[17]*In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *2 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (citations and internal quotation marks omitted).

[18]*In re C.W.*, No. 02-14-00274-CV, 2014 WL 7139645, at *3 (Tex. App.—Fort Worth Dec. 12, 2014, no pet. h.).

and ability to parent may likewise prove an endangering course of conduct.[19] Additionally, even though imprisonment alone does not prove that a parent engaged in a continuing course of conduct that endangered the physical or emotional well-being of his child, it is nevertheless a factor that we may properly consider on the issue of endangerment.[20]

The trial court heard the following evidence. In January 2012, S.G. overdosed and was hospitalized. Mother left her there. After receiving a report, CPS investigated, resulting in a disposition of reason to believe that Mother had engaged in medical neglect. Mother told a CPS investigator at the beginning of that case that she had no information on Father. Later, Mother reported that she sent S.G. to live with Father, but then Mother could not provide his address or telephone number. S.G. was living with Mother a week after that report. Father denied that S.G. had stayed with him.

In March 2013, CPS received a report that S.G. had again been left alone at a hospital. Mother was in jail. When former CPS investigator Andrew Calvin interviewed her, she told him that Father was not involved with the family. The children did not have a telephone number for Father. The children were removed, and TDFPS was named their temporary PMC.

---

[19] *Id.* at *4.

[20] *In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *17 (Tex. App.—Fort Worth Nov. 6, 2014, no. pet.) (mem. op.).

Davis met Father the day before trial. He had been in California since she was assigned to the case in February 2014. She had been unable to reach him until March 2014 because either the telephone number TDFPS had for Father was turned off or calls went directly to voicemail. But she testified that Father knew how to reach TDFPS to provide new contact information. Davis testified that Anna Salinas, the first caseworker, noted in the file that she had tried to call Father and that he reached out to her once. Davis classified Salinas's attempt to contact Father as reasonable.

Father had called S.G. approximately once a month since Davis took over the case, so S.G. gave Father Davis's contact information. Father told Davis that the children were not in TDFPS's custody because of his actions but because of Mother's and that he would do whatever it took to get them back. He also told Davis that he had moved to California to get away from Mother and to build a better life for the children. He further told Davis that he was not then in contact with I.G. and B.G. because he did not know where they were. Davis gave Father I.G.'s telephone number and gave B.G. Father's telephone number. B.G. never called Father. Father wrote I.G. and B.G. each a letter in June 2014, and he and I.G. had a texting relationship by the time of trial.

Davis testified that I.G.'s foster mother had reported that Father knew of the children's CPS history, including the fact that they had been removed from Mother. But Davis also stated that Father never took any responsibility for it.

13

Davis testified that B.G. does not want to reunite with Father. B.G. reported that in the past, Father would drive while intoxicated with her in the car, and it scared her. B.G. told Davis that life with Father had been chaotic and that she did not think she would thrive in that environment.

B.G. attempted suicide in January 2014. Davis at first testified that the cause of the attempt was B.G.'s anxiety at being returned to either parent. Later, Davis testified that the suicide attempt occurred after Mother missed visits with B.G. and B.G. concluded that Mother did not want or love her. B.G.'s therapist testified that B.G. told her that she attempted suicide because she felt abandoned by all her family.

B.G. also told the therapist that she wants to remain in foster care because Father and Mother have chaotic lifestyles, and she wants more stability. She additionally told the therapist that Father had choked her one time and that she also saw him beat up Mother or his girlfriend; the therapist did not remember which. B.G. also told her therapist that Father had been physically violent in the past.

Mother told her counselor that her relationship with Father had had some problems, mostly to do with arguing and domestic violence. She talked about physical altercations, yelling, and demeaning language on both their parts but placed most of the responsibility on Father. She admitted that the children were sometimes present during these conflicts.

14

Father testified that he believed that B.G. was still in diapers when he and Mother broke up and he left the home. B.G. was thirteen at trial. He and Mother did not have a custody agreement. Instead, he "pretty much let her keep the kids, because every time [he] tried to take them she—one time [he] tried to take them because she wasn't taking care of them, and the police told [him] if [he] ever showed up again they would arrest [him]." Father did not remember when that happened. He stated that he had talked to an attorney about taking custody from Mother before.

But he "honestly [could not] say" whether he knew that the children were in CPS's care for over a year from 2004 until 2006 or if he even saw them in 2004 or 2005. He testified that he had "seen them on and off, but as far as dates and times and stuff," he could not "honestly answer that." He admitted that he had gone up to a year without seeing them.

Father admitted that he was aware of all the times that CPS had been involved in the children's lives, that he believed it had been three or four times, and that he had never reached out to CPS to step in. He did say, however, that he had always wanted to do so but had had no way to take care of them financially in the past. He admitted that he had not had a stable home and had not been a good choice for them in the past.

Father also admitted that he had a history of family violence with Mother. He further admitted to a "pretty lengthy criminal history," including drug convictions during the children's lives as well as assault convictions. He believed

15

that he had spent maybe three years of their lives incarcerated.  Father also had a 2009 conviction for prostitution and a 2010 arrest for possession of a controlled substance.  He at first admitted that his incarceration was his own fault but then testified that it happened "because [he] didn't have [any]body.  [He] didn't have [his] children.  [He] had nothing.  [He] was, like—you know, [he] didn't have [any]thing to live for, actually . . . ."

Father testified that he had sent B.G. only the one letter, instead of letters bimonthly as ordered, because he had been too busy with work.  Father stated that he does not want B.G. to be adopted because he wants her with him.  He testified that he had not "had the reasonable time or the chance to be a father to [the children] without the involvement of their mother."  He also testified that he had been trying to get the children back for years but that they always wanted to live with Mother.

Father admitted that he had made a lot of mistakes in the past.  He did not "recall" choking B.G.  He stated that he would "whoop" or "spank" the children but had not beaten or mistreated them.  He admitted that he had driven while intoxicated but claimed that he was no longer an alcoholic.  He testified that he had last used drugs about six months before trial and had stopped drinking maybe a year before trial.  He admitted that using drugs during the pendency of the case was not responsible behavior for a parent trying to get his children back.

Father at first testified that he moved to California before the current removal but later admitted that he did so knowingly after the children came into

16

care.  He stated, though, that he moved because he could not take care of the children financially here and did not have "a stable place."  Father did not provide Davis with any proof of housing in California; he said he forgot the lease agreement.

Father's adult daughter, F.G., testified that he had had a rough life and could not always take care of his children in the past but that they loved him even when he made bad choices.  "But he's doing right now."  She admitted, however, that when she was removed from the home at about the age of ten, she had no contact with Father and that at most, her contact with him had been once a month.  She stated that Father "is not really good with phones.  He never really has a phone.  [She] just couldn't get ahold of him."

Thus, the trial court heard evidence of Father's past criminal activity, drug activity, domestic violence, and direct endangerment of B.G. through driving while intoxicated while she was a passenger and also by choking her.  The trial court also heard indirect and direct evidence of Father's history of instability and unreliability in his children's lives.  The trial court could have properly found that Father's moving to California after the removal without staying in regular contact with TDFPS or the children, his drug use there, and his failure to provide a lease agreement evidenced that his pattern of instability continued or that it at least had not been permanently replaced by stability.  Applying the proper standard of review and reviewing all the evidence in the light most favorable to the findings

17

and judgment,[21] we hold that the evidence is legally sufficient to support the trial court's endangerment findings. Further, applying the appropriate standard to our review of all the evidence while affording due deference to the trial court,[22] we hold that the evidence is factually sufficient to support the trial court's endangerment findings. We overrule Father's second and third points.

**Conclusion**

Because of our disposition of these points, we do not reach his fourth point.[23] Having overruled Father's dispositive points, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, MEIER, and GABRIEL, JJ.

DELIVERED: January 29, 2015

---

[21]*See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[22]*See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 27–28 (Tex. 2002).

[23]*See* Tex. R. App. P. 47.1; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.) (providing that along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination).

18